The first case that we will hear today is case number 128252. N.B. Financial Bank, N.A. etc. et al. Appellees v. Tim Brophy etc. et al. Appellants. For the appellants, we have been informed that two lawyers will be arguing. You've been allotted 20 minutes for your argument and you've indicated that you will split that time equally between you. Similarly for rebuttal, you have 10 minutes and you've indicated you're going to split your time on that. Now you'll see hopefully on the screen in front of you the timer and you're probably used to when you're in a courtroom being aware where the timer is. Well here it is now up on the screen and as we always do it will turn yellow and then when the 20 minutes runs out it will turn red and we'll ask you to conclude your remarks. All right, just in terms of process here, is everyone comfortable? Do you have any questions on how we're going to proceed? All right, if we're all ready then I will ask counsel for the appellants. I believe that'll be Gary Scott Piles who'll begin for the first 10 minutes followed by Kathy Sons. Mr. Piles, are you prepared to proceed? Yes, your honor. Thank you. May it please the court's counsel, my name is Scott Piles. I'm an assistant state's attorney here in Will County. I represent the Will County collector treasurer, Tim Brophy. In this case, the plaintiffs are seeking a refund of approximately 6.3 million dollars in paid property taxes that were voluntarily paid over a 12-year period beginning in 2005 and ending in 2017 while a combination preceding was pending on their property they had owned at the time, the Evergreen Terrace complex. The plaintiffs in this case have filed suit against the treasurer seeking a refund of those property taxes under section 20-175 of the LNA property tax code, which is an exception to the voluntary payment doctrine. I'm going to be addressing in my portion of the argument the standing under 20-175. The interveners represented by Kathy Sons will address the issues raised by McCausland and its progeny regarding the title versus ownership issues. Our governmental institutions are supported in part by property taxes, and those property taxes are generally paid by the property owners. Once those taxes are voluntarily paid, however, there may not be a refund of those taxes unless there's been some of a an objection or a protest made regarding those taxes unless there is a statutory exemption that allows it. As shown in Alvarez versus Pappas, the voluntary payment doctrine indicates that when property taxes are voluntarily paid, there can be no refund unless there is a statutory exemption. You stressed the voluntariness of the payment. Could the property owner have refused to pay the taxes based on the fact that a condemnation proceeding was underway? No, the case laws are pretty clear that if they weren't paid, they would probably go to tax sale and then the property owners during the process of the condemnation would lose title because a taxpayer would come in and pick up those property taxes. The proper procedure to have done, and as I'm going to argue, is that once the condemnation was filed, they should have filed a tax objection. That tax objection could be held in advance, similar to like a civil case where there's a bankruptcy of an insurance company or a party, simply the civil case is held in advance while the bankruptcy is pending. Same condition could have done here. Plaintiffs could file the tax objection regarding these, pay the property taxes, preserve their objection under the property tax code by merely filing a tax objection and having it held in advance dependency of the action. I think there was a way for the plaintiffs to both pay the taxes, protect the property, but yet preserve their objection. They did not do that here. Thank you. Under the voluntary payment doctrine, however, as Alvarez, as this court said in Alvarez, section 20-175 of the Illinois property tax code provides an exception to the harshness, as this court has called the voluntary payment doctrine. It gives some relief in certain circumstances for taxpayers to receive a refund. Under 20-175, there are three events that qualify for an exception. One, if a property is twice assessed. Two, if the property is assessed before it's taxable. And three, if the taxes have been overpaid by one or different claimants. Now, the only event here that's in question is whether or not the plaintiffs overpaid their taxes. Now, the appellate court in this case found that the 20-175 would allow the plaintiffs in this case to pay or to receive, or at least make a claim for a refund. However, the appellate court expanded the definition beyond the legislative intent by extremely expanding the exceptions under 20-175. There are three disputes here, or undisputed facts that I think are important. First, the treasurer was paid the correct amount of the assessed taxes. There was no overpayment to the collector or the treasurer in this case. Two, there's no dispute that the plaintiffs voluntarily paid their taxes. There was no objection or protest made at the time by the plaintiffs for the payment of those taxes. And three, the property in this case, regardless of who the owner was going to be, was not going to be tax exempt. This property was a real estate development. It had tenants. It was making profits. And under the Illinois Constitution, of course, public land cannot be used for private benefit. Plaintiffs in this case were making profits on the rents from the building. Mr. Pyles, I have another question that's a little bit off of your argument, but was the property assessed at a lower value after the condemnation started? I don't believe it was, Justice Cunningham. I think it was kept at the rate. While the condemnation was pending, the plaintiffs continued to rent the properties to the tenants. So no, I don't think that there was an adjustment made in the assessment. So there's been a lot of, in each of the briefs, there was discussion of rules of statutory construction. And I think there's one that's apt here. Expressio unis est exclusio alteris. Something that is mentioned, one of a class of items mentioned in a statute is to the exclusion of all others. And in the third part of section 20-175, the legislature used the word overpaid. Was there an overpayment by the plaintiffs in this case? And I would submit there was not, there was an erroneous payment made. And that's different from an erroneous assessment. Since in another part of the statute here, the wrong, if you follow the plaintiff's argument, the wrong payer paid the taxes. It was an erroneous payment, not an overpayment. So while the city had, while this, while the condemnation had been concluded, and despite the fact that this will be addressed by the intervenors or who the owner was, section 20-175 does not provide any relief to the plaintiffs. They cannot make their claim because they did not protest these taxes. As there was not an overpayment made. And this is in accord with the Sorcey versus Armstrong case, which this is an Illinois appellate court case that says that section 20-175 does not apply in situations where we are talking about an amount less than 100% of the assessed taxes. Similarly, the plaintiffs are trying to seek a windfall in this case. As I argued in my brief, typically landlords account for the payment of property taxes when they collect their rents. Here in this case, the plaintiff continued to collect rents. Assumably a portion of that was to go to the property taxes. Now that the city of Joliet is now the owner of that property, they're trying to seek a windfall by collecting the money back that they used from their renters to pay these property taxes to the exclusion of all of the intervenors services that were provided to the renters of the plaintiff's property in terms of law enforcement services and schools. So simply, I think that the plaintiffs in this case do not have a claim under section 20-175 because there was no overpayment. They paid 100% of the taxes and they were voluntarily paid. And under the voluntary payment doctrine, if there's not an exception, they may not seek a refund. And for those reasons, I would ask that the decision of the appellate court of the third district be overturned and the dismissal of the trial court of John C. Anderson be affirmed. Thank you. Good morning, your honors, counsel. My name is Kathy Sons. I represent the Forest Preserve District of Will County. I am here also speaking on behalf of all of the other intervenors who are the real parties of interest, which include the city of Joliet, park districts, school districts as well. May it please the court. Mr. Piles has spoken extensively about section 20-175 and we adopt all of those arguments and agree that this was not an overpayment. But I am here to address the more fundamental question of who actually owes the taxes in the first place. The appellate court found that the city of Joliet owed the taxes and we submit that that is error. It is error for two reasons. They relied on McCausland and an entire line of cases that followed McCausland from 1942 when 1969 I believe is the last one that addressed it, 1973 for an appellate court's case. But McCausland is not precedential of the issue that is before this court. McCausland was a lien case in an eminent domain proceeding and the court specifically said in its holding that it was a narrow issue of whether liens for real estate taxes can attach to an award of just compensation. That is not the issue we have here. The issue we have here is whether they are entitled to a refund of paid taxes rather than affecting a just compensation award. The second reason that the appellate court was incorrect is that McCausland is no longer viable under the law as it exists now. And stare decisis is a doctrine that is intended that the law develop in a principled and intelligent manner. But it's not a rigid doctrine and it does not require that we adhere to law that's no longer viable. Miss Sons, can you speak a little bit to your point regarding McCausland not being viable law any longer? So there have been several cases since McCausland and primarily one of those cases is the 2011 case of the Forest Preserve District of DuPage County. And there were some other cases that led up to that. Kirby was a United States Supreme Court case. But McCausland is founded on the notion that a taking occurs when a petition for eminent domain is filed. And McCausland relied on a case called Farwell for that proposition. That is the whole point of title relates back because everything is fixed as of that date. But that's not the law as we understand it now. In 2011, the Supreme Court said that a taking occurs no sooner than when compensation is paid and when the right to possession and title transfers. And it specifically said that it does not occur when the original petition is filed. But McCausland is founded on that proposition. There was a second aspect to both Kirby and to the Forest Preserve District case, which has to do with whether you are entitled to compensation or valuation as of the date of taking or when the petition was filed. And the court says that you're entitled to valuation at the date of taking. So again, McCausland and Downey say that you can't get any of any increase in value, but in fact, you can. And so that law has also changed. And McCausland itself, if you look at the background, and I included some of the history that led to McCausland, and that history is to provide context for the McCausland decision, specifically that it departed from previous law, specifically Dunleavy, as well as a case of Stuttgart versus Price, and instead relied on 2011, this court overturned Farwell and said that it was incorrect. So it's important to remember the context of McCausland, as well as what has happened since then. The other case that is of importance to consider since McCausland is People versus Chicago Title. And McCausland says the title relates back. Now, counsel for Appalese continually say that ownership relates back, but ownership and title are not identical. And there's nothing in McCausland that says that ownership relates back, only title relates back. And we submit that the title relation back is no longer viable because of everything I've already said, that there's no taking until later. But even if we said the title still does relate back, that's separate and distinct from ownership. And People versus Chicago Title, the court specifically said that ownership is not something that it has fixed meaning. It depends on the circumstances. And that case specifically addressed real estate taxes and said in the context of real estate taxes, ownership means, and the policy of what ownership is and taxes are, are that it is the person who controlled the property and had the right to enjoy all of its benefits. And in this case, that is the plaintiffs, or specifically those plaintiffs that are beneficiaries of the trust. So there's been, there's been changes in law, and there is an understanding of who is responsible for the taxes. During this 12 years, certainly the city of Joliet had no rights to enjoy the property. They had really no rights at all, other than the right to ultimately obtain the property in the eminent domain proceedings. So it is plaintiffs who enjoyed the benefits of the owners as the term owners is interpreted under the property tax code. Ms. Sons, does it matter that Chicago Title dealt with the land trust issue? I do not believe it does because it addressed ownership and what means ownership under the property tax code. It was not limited and it made certain statements. Certainly the holding itself was specific to the facts of those case, but all of the statements were an interpretation of the word ownership under the property tax code. And that applies equally to this case. Who should pay the taxes and the person that obtained all of the benefits, all the benefits that the interveners were providing, as well as the general benefits of ownership. There is no reason to separate property taxes from all of the other items of ownership. So again, they were paying insurance, they were receiving rents, none of that was transferred to the city of Joliet. They got to keep all of the profits that they made, all of the utilities, all of the other things associated with ownership. And property rights are typically, they use the all of the various rights that come along with it. And it was plaintiffs that had all of those rights. The city of Joliet had none of those rights. The single property ownership indicia that it had was that it had the right to perfect its eminent domain proceedings. Now there's a line council, is that something we should even be looking at? I guess, the other side of that argument is they also had the responsibility of maintaining the building and taking care of it. But do we even need to consider all of that? Well, they did have the responsibility of maintaining it and they also had the responsibility of taxes. So they all kind of go together. So I do think that one needs to consider that. Is there some statutory language that speaks to those issues about the fact that they get the income from the rentals, but they also have to pay for the upkeep of the building? I mean, is that anywhere in the statute that tells us we even need to consider that? No, I'm not aware of anything in the statute that says, but the statute speaks to owners. And that case specifically interpreted who are the owners under the statute. And again, in this case, that would be the plaintiffs. So there is in the Forest Preserve District, a case that a line that the Appleys heavily rely on. Oh my goodness. Apologies. I have the lights that automatically go off. So they have, there is something that distinguishes McCausland, but that was not a holding of the court, not a finding of the court. It was obiter dictum. It should be given little to no weight. And specifically it distinguished the tax cases. And on that ground, we would ask that you reverse the finding of the appellate court as to count one and affirm the trial court. Thank you. Will you be addressing the cross appeal in your remarks? Uh, if you would like me to address that now, I certainly ask Mr. Tesla that first, uh, your honor. Yes, I, yes, I will. I'll address it. Uh, and, uh, may it please the court. Good morning. Uh, I, uh, I'm Theodore Tesla. I'm the attorney for, uh, the, uh, plaintiffs in this appeal. Uh, the, uh, folks who were the owners of the property until it was taken by a successful kind of nation by the city of Joliet. Uh, if I may initially, uh, respond just to a couple of issues that, uh, directly came up and one is this Chicago title case. That case had nothing to do with tax liability in a condemnation. Rather it dealt with the, uh, uh, decision of who would be who within a land trust, a sort of unique Illinois creation would be responsible for, for taxes. And typically it is said that, uh, you can run, but you can't hide in this case. However, the Supreme court said to the beneficiaries, you can hide within this land trust. You can preserve your secrecy and anonymity, but you can't run from paying the that has nothing to do with the issues before the court today with respect to the tax liability of an owner in a kind of nation. And that is the ultimate issue we're dealing with here. And that is who is liable for taxes. Once a condemnation is started, uh, and established law says, you know, the owner pays the taxes until you're not the owner. Uh, and, and, and it, and in, uh, effectively what the appellants are asking this court to do is to reverse 80, at least 80 years of precedent and say that in a condemnation tax case, in a condemnation case, uh, the, uh, uh, owners will be liable for the taxes until effectively the case is old. They're saying that, uh, a new policy should be imposed, which is that we will take your property. And I have a question for you. I asked Mr. Piles, the same thing. Um, when the property taxes are imposed in these situations, normally that's passed along to the tenants. Did that happen in this case? In this case, the, uh, the, uh, uh, so-called rents, this was a section eight housing public you know, was that passed along? They were not passed along. Now they, you're saying that your, your clients, the plaintiffs bore the entire brunt of the property taxes and none of that was passed through to their tenants. Is that what you're saying? Yes. None of it was directly passed through. Now when, when the rents which were subsidized, HUD paid a part of the, of the rent, uh, there's a negotiation into, you know, how, uh, what, what the, uh, what the rents will be. And that depends on a whole host of factors, including the income of the individuals, but the, those rents were set. And then whatever thereafter the taxes turned out to be, my client had to pay them and they paid it. Uh, there was no process for recovering them from the tenants, uh, the, uh, and they, they bore the brunt of, uh, uh, of, uh, of the expenses of the operation, regardless of what they turned out to be because the rents were set. I have another question for you. Um, of course, no one can know what the outcome of any legal proceeding will be. So while your, your clients were in the condemnation proceeding, they couldn't know the outcome, but why didn't they file their file of protests or pay the taxes under an objection of some sort? So that it would be clear that they knew if that, or they thought at that point in time that they were unfairly being taxed. Your honor, my clients never intended to agree to this kind of nation. They were the owners. They intended to remain the owners. They and HUD oppose this kind of nation. We had no object, no basis for any objection, any statutory objection or protest because those all turned on whether you were the owner or not. We were the owner. We were proud to be the owner. We wanted to continue to be the owner and we're, we're, and, and that's not the gist of my question. I prefaced it with saying that no one can tell what the outcome of a legal proceeding is going to be. So having become embroiled in this condemnation proceeding, no one had a crystal ball to know how it was going to end. Did your clients consider, and why didn't they consider if they didn't filing an objection or protest as they paid their taxes for those many years? Quite frankly, your honor, there's no process, no procedure for, for doing so. Anything we would have filed would have been not right, hypothetical and speculative. And we, we certainly didn't want to take, my clients certainly didn't want to take the position of suggesting that we might lose this and might not be the owner. And, and it, as the appellate court noted, there was no basis for filing such an objection. Counsel's talked about what we might've done and, you know, that would have been a speculative thing to do. It would have been counter to our intentions in the case. So quite frankly the process you outlined is nowhere provided in the law or statutes or regulations and was contrary to my client's intention to remain the owners of this property. They didn't want to undercut that position in any way, shape, or form. And they were fully confident and expecting and were determined to, to, to win and keep this property as a low-income housing rather than the park that Joliet said they wanted to tear it down and make it. Incidentally, it's still low-income housing, much as it was in my client's hands. But I hope that answers your question. I'm, I'm. Thank you. Mr. Tetzloff, I have a question regarding that. You know, during all of this, could the, the city of Joliet, could they have abandoned or sought a voluntary dismissal of their condemnation proceedings? At any time. They could have abandoned it at any time. And as I think was pointed out earlier, we needed to pay the taxes to avoid a tax sale. We needed to pay the taxes to avoid foreclosure on our mortgage. And we, and we were determined to keep the property. So, but yes, Joliet and any condemning authority can abandon until the end. And does, you know, the fact that, you know, the taxes are paid and the mortgage is up to date, does that factor into what the Just Compensation Award ultimately is? Well, the Just Compensation Award is determined on market values at the date of valuation. And I respectfully suggest that the Forest Preserve case and Kirby had nothing to do with tax liability and a condemnation. They solely dealt with valuation for Fifth Amendment Just Compensation purposes. There's been reference to so-called benefits. There is no record in this case of any benefits accruing to my client, accruing to ownership. And regardless of any benefits there, there might've been, there's no record of any such thing. Are they allowed to keep the rents? Yes, yes. So any profit, anything that came from their continued ownership interests, they were able to keep? Yes, they were. And any loss they were obliged to bear. There was no assurance of profit and, and the record is, is absolutely silent as to any of these so-called benefits. But there's clear detriment to just simply initiating a condemnation as this court has, has recognized that particularly in the Public Building Commission of Chicago against Continental Bank, where they said the mere filing of a petition to condemn effectively encumbers the land, imposing a burden upon it, impeding its transfer, and to that extent, destroying the fee simple estate of the owner. In addition, the condemned owners are obliged to those benefits never come into consideration in determining tax liability. If the business makes money or if it loses, doesn't have a what to do with anybody's tax liability. I had, there was some reference to the correct amount of tax was paid. The correct amount in this case was zero. It was my clients after they ceased to be owners under the well-established authority of this court and under the statutes ceased to be the owner as of the date the condemnation petition was filed. Yeah, they paid the taxes because they didn't want to lose it otherwise. And, and, and yet, so the correct, correct amounts after they lost the property when they ceased to be owners was zero, just as it would be if you or I owned it, we wouldn't own a dime on it. That's the correct amount. Is your argument that the property became tax exempt once the condemnation action was filed? No, we're not arguing tax exemption to the extent exemption is used. We're referring to simply the, these owners weren't obliged to pay the tax because they weren't owners anymore. And as counsel, I think alluded the, there would, there was always going to be an owner here. It ceased to be my clients as of that date, the petition was filed and became Joliet. So there was an owner potentially liable for this non-tax exempt property. And it happened to be Joliet. And as far as those, the water and the police, you know, the owner benefited from that, whether it was my client or, or retroactively Joliet and the people who lived in that property benefited from the police protection and the water. Those are benefits accorded to all citizens. There's nothing specific that was accorded to our clients in this situation. And as I said, there was, there was always an owner because it was not, we don't contend it was tax exempt. Joliet did not employ it for a tax exempt purpose. They chose not to. Mr. Tetzlaff, I have a question, a follow-up question to Justice Neville. Is, is there, are we wading into legislative territory here? Shouldn't there be some, a legislative fix as to who is responsible for taxes once the condemnation proceeding ensues? Your opponent points out that McCausland is outdated and therefore the time, the filing, the time of the filing of the condemnation proceeding should not be used for this purpose any longer, but you're saying, yes, it should. Now, isn't this something that the legislature should be considering? Then we wouldn't, we wouldn't be here arguing about this. It would be clear that the point in time at which the taxes are fixed is a specific date, certain. Well, when the legislature actually has dealt with this by 9, 185 and 2325, or specifically dealt with the liability for taxes in a condemnation situation and, and acknowledged and reinforced this court's law that liability for taxes ends the date the condemnation petition is filed. So you're, you're quite right. You can always write more laws, but they have written some that, that deal with exactly this, this point and support the principle that taxpayers liability for taxes ends when ownership ends. And that ends on the date of a condemnation. Uh, I don't think we need any more legislation. Mr. Ted, how do you square, um, your argument with the fact that your clients kept receiving the rents and kept them, um, for the property that they say on the other hand, that they don't own once the condemnation proceedings were filed. Well, that's always the case of the condemnation, your honor. And, uh, this one happened to take a long time, but to getting receiving rents, there's no assurance that you're making a profit. And one thing is clear. You can't, I didn't ask that. I asked how, if they were no longer the owners, how you can square that they could keep the rents received, but they didn't have tax obligation because they has been in the law that the, uh, uh, that the, while you're the owner, you know, you get the rent, but you got to pay the expenses. But in terms of a condemnation situation, the, the, uh, policy has been, and the law has been that your obligation, at least for the taxes will end if the condemnation is successful. Uh, it's, it's sort of like saying that, uh, okay, we're going to take your property and we're going to finish it when we get around to it, but at least you're not going to have to pay the taxes while we're doing it to do the other side would perhaps be an incentive to a condemning authority to, to drag out a condemnation because we get to condemn it. And, uh, you get to pay the taxes while we're taking our time to, to condemn it. Uh, admittedly, this was a long one, but, uh, typically, uh, uh, they're not so long and the taxpayer under established policy and law is at least not obligated to pay the taxes while his property his or her property is being condemned. Yeah. Uh, with respect to the equitable relief point, uh, we believe the 2175 as the appellate court held does provide a statutory basis for the refund, but in the event, it does not. And given the absence of any, any statutory procedure for protest, we would have no adequate remedy at law. And that would be the basis for this court or any court invoking its equitable jurisdiction and authority to address the taxes that were unauthorized to be imposed against a non-owner. There's been reference to the voluntary payment doctrine. We'd submit it doesn't apply here by if it were to apply, uh, the payments that we made, we suggest we're clearly not voluntary in light of our obligation to make the tax payments to avoid tax sale or foreclosure. Your honors, we respectfully submit the 2175 does provide a remedy for a refund as the third condition, uh, equitable relief would lie, uh, regardless of the applicability of 2175. Thank you. Also, are there any other comments you'd like to make? No, your honor. Okay. Thank you very much for your argument and rebuttal. Mr. Piles. I may appease the court. Obviously the plaintiffs in this case want to have their cake and eat it too. They want to keep the rents, but they don't want to pay any taxes or the obligations that would support the renters that were in their buildings. They want to have it both ways. What they could have very simply done is file the tax objection, which is the procedure under Illinois property tax code, the suggestion by the plaintiffs that it wasn't right. I think he has no basis. Once the condemnation case was filed, there's the basis. They could possibly lose this property. They file a tax objection and hold it into advance while the, while the condemnation case is pending. That was the procedure that should have been done here. I don't want to protect the rights of the plaintiffs to protest the taxes in the event that the condemnation went through. What it seems to me is here, the plaintiffs made a strategy choice. Well, we don't want to object to the taxes because well, that could hurt our case in the condemnation and you can't have it both ways. And what the plaintiffs here are seeking is a windfall. I would suggest to the court that it's fairly obvious that the buildings were doing relatively well for the plaintiffs. Otherwise they wouldn't have fought as hard during the 12 years to keep it. And as to make a suggestion that somehow that they were going to bear the front of the property taxes, I don't think passes the laugh test. Certainly there's going to be any landlord that has a building that's going to account for other expenses when they're calculating how much to charge for rent on these buildings. Can't have it both ways. You want to keep the money that they charge the renters, but they don't want to have to pay the enforcement services that were going to be there. You can't have it both ways. 20-175 does not apply to the plaintiff's claim in this case because it is not one of the exceptions in the statute. They did not make an overpayment on their taxes. They paid 100% of the taxes at the time that they were owed and they were the owners at the time that they were paid. If there was a problem because of the condemnation, there was going to be a change. They should have filed a tax objection, which is the procedure under the Illinois Property Tax Code. Very simple. The suggestion that somehow it wasn't ripe, and again, there's a lot of time spent in the briefs on, well, this wasn't right. We couldn't have filed. I would submit to the court that where there's smoke, there's fire. If they know that there's a weakness in their case, that's it. They made a litigation choice not to file a tax objection because they didn't want to weaken their case in the condemnation. You can't have it both ways. If they wanted to preserve their right for a refund, they should have made an objection and the voluntary payment doctrine should apply here. Section 20-175 does not provide for an erroneous payment. It applies when there is an overpayment and there's been no suggestion that they overpaid the tax bill at the time that they were paid. Mr. Piles, how is it an erroneous payment? Because at the time, they were legally required to pay the taxes and that was the amount that they paid is the amount that was assessed. So define for me what the error was. Well, if the city of Juliette was the retroactive owner of these properties, then the wrong party presumably made the tax payment. Because if the plaintiffs in this case were not the owners retroactively, then they should have not, if they were the wrong party, made the payment on the taxes. I mean, that's kind of the argument that's being made by the plaintiffs here. As the Sorcey versus Armstrong case suggests, Section 20-175 does not apply when there is a dispute for less than 100% of the tax bill. And what the plaintiffs are suggesting is that, well, we didn't owe these taxes because we were the wrong party. We didn't owe them. And I would submit to you that they, in a convoluted way that this works, where there is a retroactive owner, I would suggest to you that the wrong party paid the taxes under the way it's set up and that they shouldn't have made the payment in the first place if they were not going to be the owners. Now, under the system that's set up, it's a discussion. Justice, you're muted. How could they know, how could the plaintiffs know what the outcome of the condemnation proceedings were, was going to be? And that's the argument that they weren't the wrong party. They were the right party at the time they paid the taxes because the taxes was assessed and the this would be in a completely different posture. So I'm not sure that I'm connecting the dots of your argument. Well, what I'm suggesting is that to the extent that when they were put on notice that there was going to be a condemnation, there was a chance that they could in fact lose the property. And Justice O'Brien is correct. The city of Joliet could have abandoned it. But that's why you file the tax objection anyway. You preserve your rights. It's done all the time. You preserve your rights in that case. Let me ask you this. If they had filed a tax objection, would we be here? Would you, would you, would the city have conceded that they're entitled to a refund? Say they had taken your advice retroactively and filed a tax exemption. Would you say that they would then be entitled to all the taxes that they paid? I would suggest to you that the voluntary payment doctrine did not apply, which is what we're suggesting here. Because if they had, if they had filed the objection, then they would not have voluntarily paid the taxes. So they would be entitled to the refund? Yes. If they had filed a tax objection and held it in abeyance, yes. They would, they would probably be entitled to a refund if they filed the proper procedures for filing a tax objection. That's correct. Because the voluntary payment doctrine would not be in effect. Okay. Thank you. You may proceed. Thank you. I will disagree with Mr. Piles with respect to the last point because I believe that in fact they were the correct party to pay the taxes and they would not be entitled to a refund. They were the owners. They enjoyed the benefits. The taking occurred later, not at the time of the petition. Being the owners, they were responsible for the taxes and not entitled to any refund or under any circumstances. I would like to address briefly the cross appeal with respect to accounts two and three for equitable relief. And there are a couple of points to be made. And one of them is I implore the court to read the complaint and read the allegations. Mr. Tetzlaff is now arguing that, you know, exemption is in broad terms that they weren't the owners. That's actually not what the complaint says. The complaint is based on exemption and it doesn't say that these owners were exempt because they weren't owners retroactively. What counts two and three specifically say is that the properties are exempt, that those properties don't own taxes and exemptions has a meaning under the property tax code. And it's not with respect to who owes the taxes, it's with respect to whether an exemption applies. And no exemption applies in this case. It would not have applied to plaintiffs but also would not have applied even if Joliet had owned the taxes. With respect to policy, Mr. Tetzlaff has said that it is the policy that in a condemnation case the taxes are owed by the condemning party. That is not the policy. It's not what McCausland says and it's certainly not what the Chicago title case says. The Chicago title case specifically addresses what the policy is with respect to the property tax code and who the owners are and who are responsible for the taxes. And that is the party who receives the benefits of ownership. With respect to retroactive title, again, Mr. Tetzlaff's argument is somewhat circular. Can I ask you, isn't there some diminution to the benefits of ownership simply because of the condemnation proceedings? I mean, has addressed that issue with respect to taking. And yes, it is an encumbrance on the property, but it is not an encumbrance of constitutional proportion. And that argument was made before the court in Kirby. The plaintiffs in that case had said, listen, we're going to have to pay property taxes. So, you know, there was a taking and the court said, no, no, you could sell the And again, in the 2011 case of the Forest Preserve District, Kirby was in part adopted and the court said there's no taking until later. Ms. Senn, are you saying that there is no or negligible diminution in property value once the condemnation proceeding is in place or in effect? Is that what you're saying? Well, the value of the property. There was no loss of property value? The property value when, in terms of the taking and what the condemn nor pays ignores any diminution by what's going to eventually happen or the reason that it's taking. It's determined by market value. And in fact, in this case, they obtained, they requested and obtained market value at a date much later than when the proceedings were initially filed. They obtained the increased value. So we believe that counts two and three should be, the appellate court should be affirmed with respect to reversal and with respect to count one, the appellate court should be reversed. Thank you so much. MB Financial versus Brody, agenda number five, number 128252 will be taken under advised.